UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

№ 03-CV-5927 (JFB) (WDW)
_____

JOSE ABREU,

Plaintiff,

VERSUS

SUFFOLK COUNTY POLICE DEPARTMENT, NEW YORK CITY POLICE
DEPARTMENT & THE CITY OF NEW YORK,

Defendants.

_____

MEMORANDUM AND ORDER
February 23, 2007
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Jose Abreu ("Abreu"), is a former police officer in the New York City Police Department (the "NYPD") who was subsequently employed as a police officer by the Suffolk County Police Department (the "SCPD"). Abreu brings this action against the SCPD, the NYPD, and the City of New York, pursuant to Title VII, 42 U.S.C. §§ 2000e, *et. seq.*, the New York State Human Rights Law, N.Y. Exec. § 290, *et. seq.* (hereinafter, "NYSHRL"), and the New York City Human Rights Law, New York City Administrative Code § 8-107 (hereinafter "NYCHRL"), alleging that he was discriminated against by the SCPD based upon his national origin, and was retaliated against by both the SCPD and NYPD because of his Equal Employment Opportunity complaint (hereinafter "EEO complaint") with the NYPD and for other alleged protected activity. Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons that follow, defendants' motion is granted in part and denied in part.

I. BACKGROUND

A. THE FACTS

Construed in the light most favorable to plaintiff, the non-moving party, the facts are as follows:

On July 7, 1999, plaintiff was hired as a police officer in the NYPD. (SCPD's 56.1 ¶

1.)[1] Plaintiff was assigned to the 110th Precinct. (Pl. Dep. 16.)

At the time plaintiff took the examination for the police officer position with the NYPD, plaintiff also took an examination to be appointed a police officer with the SCPD. (Pl. Dep. 39.)

1. Plaintiff as a Witness in Internal Affairs Investigation

According to plaintiff, on February 2, 2002, he was off-duty and observed NYPD Lieutenant Lombardi and an NYPD Captain involved in a search of four or five Hispanic individuals at gunpoint. (Pl. Dep. 21-23.) Thereafter, an Internal Affairs Bureau (the "IAB") investigation of that incident took place, in which plaintiff was identified as a witness. (SCPD's 56.1 ¶ 4.) Plaintiff asserts that he did not voluntarily participate in the investigation or identify himself as a witness, but rather was identified as a witness in a report by another police officer who arrived at the scene. (Pl. Dep. 25, 121-122.)

2. Plaintiff's EEO Complaint while Employed with the NYPD

According to plaintiff, prior to this February 2 incident, an EEO complaint was filed on his behalf by Lieutenant Pistere, in which it was alleged that plaintiff had been subjected to racial discrimination. (Pl. Dep. 29-37.) In particular, the complaint related to an alleged incident involving plaintiff and his NYPD Captain in which the Captain engaged in actions that were racial in tone regarding plaintiff's unit assignment and potential transfer. (Pl. Dep. 30-33.) Plaintiff asserts that, after he raised the topic of race with this Captain, he was ordered into a squad car, taken back to the precinct, ordered to stand in the same location as police detainees during arrest, physically bumped, and threatened with the prospect of remaining a patrolman for the remainder of his career. (Pl. Dep. 31-33.)

Plaintiff recalls that, during his meeting with the IAB, both the February 2 incident and his EEO complaint were discussed. (Pl. Dep. 27-29, 37-38.) Plaintiff subsequently applied to become a police officer with the SCPD. (SCPD's 56.1 ¶ 8.)

3. Telephone Calls by the NYPD to the SCPD during Plaintiff's SCPD Application Process

On April 18, 2002, plaintiff spoke with Suffolk County Police Officer Richard Michalski ("Michalski"), who was the officer responsible for processing his application with the SCPD. (*Id.*) During that conversation, Officer Michalski told plaintiff that he had received an anonymous telephone call from the NYPD in which Officer Michalski was told that plaintiff was involved in an Internal Affairs investigation and that the SCPD should not hire plaintiff. (*Id.* ¶ 9.)

In particular, the SCPD Application Investigations Unit received two telephone calls from the NYPD during the plaintiff's application process. The first call was placed to police officer Ibanez ("Officer Ibanez") at the Suffolk County Processing Division on April 17, 2002. According to Officer Ibanez, a male caller who did not identify himself stated that the SCPD should "watch out" for plaintiff and that if he got into trouble "he would use the race card." (Eichenholtz Decl., Ex. E.) The second telephone call was placed

---

[1] Where one party's 56.1 Statement is cited, the other party does not dispute the facts alleged.

to Officer Michalski on April 18, 2002. Officer Michalski stated that a male caller, who did not give his name, claimed that he was "on the job" with plaintiff and that plaintiff was involved in a "big investigation" and, in reference to that investigation, the caller said, "IAB has it." (Eichenholtz Decl., Ex. F.)

Officer Michalski subsequently told plaintiff that, because plaintiff was only a witness to the Internal Affairs Investigation and not the subject of any investigation, he could resign from the NYPD and be hired by the SCPD. (SCPD's 56.1 ¶ 10.) Plaintiff was hired by the SCPD on April 22, 2002 and subsequently began his recruit training at the SCPD Academy. (*Id.* ¶ 11.) As a new hire with the SCPD, plaintiff was placed on an 18-month period of probation. (*Id.* ¶ 13.)

The NYPD IAB investigated the source of the telephone calls placed to the SCPD concerning plaintiff. (Eichenholtz Decl., Exhibit H.) As an initial matter, the NYPD reviewed the numbers from which the calls originated and found that one call originated from the 110th Precinct (where plaintiff was previously assigned) and the second call originated from the residence of NYPD Lieutenant Lombardi. (Eichenholtz Decl., Ex. G.) On or about May 7, 2002, at an IAB interview, Lieutenant Lombardi admitted to placing the telephone calls to the SCPD. (Eichenholtz Decl., Ex. I, at 192-93.) Lieutenant Lombardi stated that he did not speak with anyone prior to making the telephone calls, that he was not directed by anyone to make the calls, and that they were made "totally independent of anyone within [his] command or in the NYPD." (*Id.* at 230-31.) Following the IAB investigation, the IAB concluded that the allegation that Lieutenant Lombardi made improper telephone calls to the SCPD was substantiated. (Eichenholtz Decl., Ex. H, at 249.)

5. Plaintiff's Performance at the SCPD Academy

On October 9, 2002, during his training at the SCPD Academy, plaintiff received a Command Discipline because of his failure to report on time to the Academy on September 9, 2002. (SCPD's 56.1 ¶ 14.) Specifically, on that date, plaintiff overslept, he was awakened by a telephone call, and arrived three hours late. (*Id.*) Although plaintiff does not dispute that he was late that day, he claims that he was treated more severely for that infraction than others in the academy.[2] (Pl. Dep. 56-59; Germain Dep. 86-88; Giovannello Dep. 26.) In particular, plaintiff testified that he was punished "several times" for this infraction, including forfeiting one day of accruals, being docked financially, and "a bunch of things." (Pl. Dep. 59.) Plaintiff claims he "had to" sign the Command Discipline. (Pl. Dep. 58.)

Plaintiff received a second Command Discipline on October 2, 2002 in connection with the sale of a firearm by plaintiff to his academy classmate, James Giovanniello, that occurred on September 16, 2002. (SCPD's 56.1 ¶ 16.) According to Giovanniello, he approached plaintiff to purchase the firearm while they were both cadets in the academy. (Giovanniello Dep. 12-13.) Prior to the purchase, Giovanniello asked Officer Conroy, who was the SCPD counselor assigned to both plaintiff and Giovanniello, about the proper procedure for the purchase of plaintiff's

---

[2] According to the SCPD, any lateness involving other probationary officers was only for a few minutes, rather than several hours. (Termini Reply Decl. ¶ 7.)

3

firearm. (*Id*. 14.) Officer Conroy referred Giovanniello to Lieutenant Jablonsky, who was an officer at the SCPD firing range, for approval of the gun sale. (Giovanniello Dep. 14-16, 24, 30.) According to Giovanniello, Lieutenant Jablonsky told Giovanniello that there were no restrictions regarding the sale of the firearm, but that Giovanniello and plaintiff would need to complete required forms. (Giovanniello Dep. 15-17.) Subsequently, plaintiff received a Command Discipline and forfeited two days of accruals. (Pl. Dep. 59-61.) Plaintiff claims that he was treated differently than Giovanniello, who was questioned regarding the transaction, but never disciplined in connection with the firearm sale.[3] (Giovanniello Dep. 17.) Plaintiff was subsequently issued a third Command Discipline in connection with his failure to write an Internal Correspondence about the incident when directed to do so. (Pl. Dep. 59-61.)

On September 21, 2002, plaintiff arrived on the scene of a motor vehicle accident involving a friend, who was an off-duty NYPD officer. (SCPD's 56.1 ¶ 18.) According to plaintiff, he arrived at the accident scene in civilian attire and did not appear in an official capacity in connection with his status as an SCPD cadet. Plaintiff testified that, upon arriving at the scene after getting a call from his friend, police cars, an ambulance, and bystanders were present. (Pl. Dep. 64-74.) Plaintiff showed one of the police officers on the scene the employee identification provided by the SCPD and told him he was "on your job" and was a friend of the injured officer. (*Id.* 74-76.) The officer involved in the accident was arrested for driving while intoxicated. (Eichenholtz Decl., Ex. L.) Plaintiff failed to notify the Academy that he had had contact with a member of the police outside of the Academy. (SCPD's 56.1 ¶ 19.) According to plaintiff, he did not advise the Academy of this incident because it did not involve him in any way and because he had rendered valuable assistance to the officers at the accident scene. (Pl. Dep. 92-93.) In a memorandum concerning the incident, a Suffolk County police officer stated that plaintiff had provided information regarding the location of the injured officer's weapon, which had been displaced during the accident. (Eichenholtz Decl., Ex. L.) The officer noted in his report that "[d]uring my contacts with PPO Abreu I never felt that his actions were obstructionist. Although, [sic] PPO Abreu's intrusive actions were a nuisance, he in fact provided me with some useful information about the case." (*Id.*)

According to the SCPD, plaintiff was asked to write an Internal Correspondence concerning his role at the accident and submitted three internal reports that contained three different versions. (SCPD's 56.1 ¶¶ 20-21.) Plaintiff disputes this assertion. Specifically, plaintiff claims that he was required to write three internal reports about this incident because Sergeant Germain required him to do so and Sergeant Germain re-wrote a series of questions to which plaintiff was required to provide answers. (Pl. Dep. 93-94.) Sergeant Germain was one of the two sergeants in the recruit training section during the administration of plaintiff's training class and had responsibility for

---

[3] According to the SCPD, plaintiff was not disciplined for the sale itself, but rather because he disregarded a direct order given to him by Officer Conroy to check back with him prior to making the sale. (Termini Reply Decl. ¶ 8.) In addition, the SCPD contends that, even if they wanted to discipline Cadet Giovanniello, they were unable to do so because he was under the jurisdiction of the Rockville Centre Police Department. (*Id.*)

scheduling, discipline, and evaluations. (SCPD's 56.1 ¶¶ 23-24.) Plaintiff asserts that these actions by Sergeant Germain led to three different versions of the reports. (*Id.*)

According to Sergeant Germain, based upon Abreu's misconduct relating to the Command Disciplines and his actions concerning the motor vehicle accident, he concluded that Abreu's performance was below that required of a recruit and recommended to Lieutenant Gorman, who was the Commanding Officer of the Recruit Training Section, that plaintiff be terminated. (Germain Dep. 18-19, 81, 83.) Sergeant Germain testified that he never knew that plaintiff was involved in any complaints with the NYPD during his employment there. (Germain Dep. 110.)

According to Lieutenant Gorman, he became aware of the Command Disciplines regarding Abreu, spoke to Sergeant Germain, and concurred with Sergeant Germain that plaintiff should be terminated. (Gorman Aff. ¶¶ 4-6.) He then recommended to the Commanding Officer of the Police Academy, Deputy Chief Donna Engel ("Deputy Chief Engel"), that plaintiff be terminated. (*Id.* ¶ 7; Eichenholtz Decl., Exhibit O.) Lieutenant Gorman asserts that he had no knowledge of any existing problems between plaintiff and the NYPD at the time of his recommendation. (*Id.* ¶ 8.) Deputy Chief Engel received the termination recommendation from Lieutenant Gorman, agreed with it, and forwarded it so that it would be sent to the Police Commissioner. (Engel Aff. ¶¶ 3-4.) Deputy Chief Engel asserts that she had no knowledge of plaintiff's involvement with the NYPD until after his termination. (*Id.* ¶ 5.) Plaintiff was terminated from the SCPD on October 11, 2002. (SCPD's 56.1 ¶ 12.)

6. Plaintiff's Conversations with Detective LaVista

Following his termination, plaintiff spoke with SCPD Detective Wanda LaVista ("Detective LaVista") in an effort to meet with the Suffolk County Police Commissioner regarding his termination. Detective LaVista, in addition to working in the Crime Analysis Unit, was a Special Assistant to the Commissioner for community affairs, which included her participation in community events that the Commissioner was unable to attend. (LaVista Dep. 15, 18, 26.) Detective LaVista's initial contact with plaintiff occurred in December 2002 during a telephone call in which plaintiff wished to speak with the Police Commissioner in connection with his employment. (SCPD's 56.1 ¶ 31.) She advised plaintiff during that call that she would have to speak to the Commissioner's Office. (*Id.* ¶ 32.) Detective LaVista determined that the Commissioner would not speak with plaintiff and subsequently contacted plaintiff and advised him that his request to speak to the Commissioner was denied. (*Id.* ¶ 33.)

Detective LaVista had another telephone conversation with plaintiff on April 11, 2003, which was taped by plaintiff. (*Id.* ¶ 34.) On the recording, Detective LaVista states that she had previously been advised that plaintiff had filed an EEO complaint with the NYPD and that she was unaware as to how the SCPD became aware of that information. (*Id.* ¶ 35; Tape Transcript, at 6-7.) She further stated, apparently in reference to the EEO complaint, "I guess that's what frightened them and they look into it." (Tape Transcript, at 6-7.) More specifically, the taped conversation went as follows:

Abreu: Cause how would they, you

5

|  |  |
|---|---|
| | know – I don't know how they even knew that I did an EEO in the City and stuff like that. |
| LaVista: | I don't know. They just know it. Do you know what I mean? I don't know it. |
| Abreu: | Yeah. |
| LaVista: | It was just told to me, so – |
| Abreu: | All right. |
| LaVista: | You know, I didn't question how they knew it. You know what, I didn't know what was going on with it. |
| Abreu: | Yeah. |
| LaVista: | And I guess that's what frightened them and they look into it. Do you know what I mean? |

(Tape Transcript, at 6-7.) Later in the conversation, plaintiff stated, "And I know they're scared of me, because anybody in law enforcement know they blackball you when you do stuff like that," and Detective LaVista responded, "Oh sure." (*Id*., at 9.) She then told plaintiff that she was not going to advise him on how to proceed. (*Id.*)

Detective LaVista testified at her deposition that she was informed of plaintiff's EEO complaint by Linda Nyala, who was President of the Puerto Rican Women's Association and by an SCPD narcotics officer, but was not informed by anyone in the Commissioner's Office. (LaVista Dep. 28-29, 37-39.) In connection with her "[o]h sure" remark, Detective LaVista explained at her deposition that she was simply "going along with the conversation with him" and that she did not believe it was common for employees to be retaliated against. (*Id.* at 41.)

B. PROCEDURAL HISTORY

Plaintiff filed a complaint in this action on November 21, 2003, within 90 days of receiving his right to sue letter from the EEOC. An amended complaint was filed on May 24, 2004. Plaintiff's amended complaint, among other things, alleges violations of Title VII, the NYSHRL, and the NYCHRL, arising from the SCPD's alleged unlawful termination based upon plaintiff's national origin, and from alleged retaliation by the SCPD and the NYPD based upon protected activity by the plaintiff during his employment with the NYPD. The case was originally assigned to the Honorable Thomas C. Platt and, on February 23, 2006, the case was reassigned to the undersigned. In August 2006, defendants moved for summary judgment. Oral argument was held on September 15, 2006.

II. DISCUSSION

A. SUMMARY JUDGMENT STANDARD

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006).

6

The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 247. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g., Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

## B. DISCRIMINATION CLAIM

Plaintiff alleges discrimination based upon national origin in connection with his termination by the SCPD in October 2002. As set forth below, the SCPD has demonstrated that it is entitled to summary judgment on this

claim because no reasonable jury could find national origin discrimination based on the record in this case.

1. Legal Standard[4]

Because plaintiff presents no direct evidence of discriminatory treatment based on her national origin, the Court reviews his claim under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-3 (1973). To establish a *prima facie* case of racial discrimination under Title VII, a plaintiff must show (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir. 2000). The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "de minimis." *See Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).

Once plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason for the' termination." *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996)). If the defendant carries that burden, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson*, 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Patterson*, 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs*, 450 U.S. at 253).

To meet this burden, the plaintiff may rely on evidence presented to establish her *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). It is not sufficient, however, for a plaintiff merely to show that he or she satisfies "*McDonnell Douglas*'s minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James v. New York Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000). Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.*; *Connell v. Consolidated Edison Co. of N.Y.*, *Inc.*, 109 F. Supp. 2d 202, 207-08 (S.D.N.Y. 2000).

As the Second Circuit observed in *James*, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove – particularly

---

[4] Discrimination and retaliation claims brought under New York law are analyzed under the same framework as Title VII. *See, e.g., Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264 n.1 (2d Cir. 1999) ("Because New York courts require the same standard of proof for claims brought under the NYHRL as for those brought under Title VII, we analyze these claims in tandem.").

discrimination." 233 F.3d at 157; *see Lapsley v. Columbia Univ.*, 999 F. Supp. 506, 513-16 (S.D.N.Y. 1998) (advocating elimination of *McDonnell Douglas* test in favor of simplified approach focusing on ultimate issue of whether sufficient evidence exists to permit jury to find discrimination); *see also Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

2. Application

The SCPD argues that plaintiff cannot establish a *prima facie* case because he cannot demonstrate that he was terminated under circumstances giving rise to an inference of national origin discrimination. However, for purposes of this motion, the Court assumes that plaintiff has satisfied the minimal burden required by *McDonnell Douglas* to make out a *prima facie* case. In response, defendant has put forth a non-discriminatory reason for the termination – namely, plaintiff's poor job performance as a probationary employee at the Academy. Hence, the Court proceeds directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find national origin discrimination by examining each parties' evidence individually and then proceeding to evaluate the evidence as a whole. *See Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir. 1997); *Tomney v. Int'l Ctr. for the Disabled*, 357 F. Supp. 2d 721, 742 (S.D.N.Y. 2005); *see also Siano v. Haber*, 40 F. Supp. 2d 516, 520 (S.D.N.Y.), *aff'd mem.*, 201 F.3d 432 (2d Cir. 1999); *Lapsley*, 999 F. Supp. at 515.

In support of its position that plaintiff was fired due to poor performance, the SCPD points to evidence that plaintiff was given multiple Command Disciplines during his probationary period at the Academy and engaged in other problematic conduct, which included the following: (1) plaintiff failed to appear for work, arriving three hours late because he overslept; (2) plaintiff failed to obey a direction from a superior officer in connection with plaintiff's sale of a handgun to another officer and failed to write internal reports of that incident as requested; and (3) plaintiff failed to advise the Academy officials regarding his contact with police at a motor vehicle accident involving another officer and then gave inconsistent versions of his involvement at the scene.

Plaintiff contends that he performed his duties in a satisfactory manner. More specifically, he disputes that he did anything wrong with respect to certain Command Disciplines and, as to other infractions, asserts that he was disciplined more harshly than other cadets. For example, although admitting he was late to class, plaintiff pointed to deposition testimony suggesting that other cadets were also late to class and were merely required to write internal correspondence explaining their lateness, rather than being issued a Command Discipline. (Plaintiff's Opp. at 6.) With respect to the sale of a firearm, plaintiff points to the fact that the other cadet involved in the sale was not disciplined. (*Id.* at 7-8.) With respect to his appearance at the accident scene of an NYPD officer, plaintiff contends that there is no policy, procedure or custom which precluded him from appearing at the accident scene in an unofficial capacity. Moreover, he attributes his inconsistent version of events to the fact that he was required to write three separate internal correspondences in connection with

the incident, which contained different questions. (*Id.* at 8-9.)

Although plaintiff argues that this evidence demonstrates that he was subject to divergent terms and conditions of employment as compared to his similarly situated co-workers, the Court finds that argument unavailing. As a threshold matter, plaintiff was not terminated after the lateness incident or the gun sale, but rather was terminated after the third incident involving his off-duty appearance at the car accident of a friend, who was an NYPD officer. In terms of similarly situated employees, plaintiff has failed to point to any other cadet involved in multiple incidents of comparable seriousness who was not terminated. *See Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (stating that to be "similarly situated" for Title VII purposes, plaintiff must establish "reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's case, rather than a showing that both cases are identical," and their acts must be "of comparable seriousness"). In addition, plaintiff has put forth no evidence that could support a reasonable inference that any inconsistent disciplinary actions were motivated by his national origin. Instead, he simply speculates that, because he was the "lone Dominican cadet in the SCPD Academy," his termination must have been due to his national origin. (Plaintiff's Opp. at 7.) Such speculation, in the absence of any proof to support it, is insufficient to overcome defendants' summary judgment motion as to the discrimination claims based on national origin.

In sum, considering the evidence as a whole, and viewing all the evidence in the light most favorable to plaintiff, no reasonable jury could find that plaintiff was terminated because of his national origin. Although plaintiff has offered several arguments to defeat summary judgment, "their combined weight is negligible, and no disputed material issues of fact remain." *Pisana v. Merrill Lynch & Co.*, No. 93-CV-4541 (LMM), 1995 U.S. Dist. LEXIS 10296, at *29 (S.D.N.Y. July 20, 1995) (granting summary judgment as to the ADEA claim). Plaintiff relies on pure speculation and has not produced sufficient evidence to support a rational finding that, more likely than not, plaintiff's national origin was the real reason for the termination. As the Second Circuit has stated, "[t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). Accordingly, the Court finds that plaintiff failed to raise a genuine question of fact as to his national origin discrimination claims and grants defendant SCPD's motion for summary judgment on such claims.

C. RETALIATION

1. Applicable Law

Title VII prohibits an employer from firing an employee in retaliation for having made a charge of discrimination. 42 U.S.C. § 2000e-3(a); *see also* N.Y. Exec. Law § 296(1)(e); N.Y.C. Admin. Code § 8-107(7). "Title VII is violated when 'a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.'" *Terry v. Ashcroft*, 336 F.3d 128, 140-41 (2d Cir. 2003) (internal citations omitted). To establish a prima facie case of retaliation, a plaintiff must show (1) he engaged in a protected activity; (2) defendant was aware of that activity; (3) he

suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 66 (2d Cir. 1998); *see Terry*, 336 F.3d at 141.

2. *Prima Facie* Case

Retaliation claims are similarly governed by the burden-shifting framework set out by the Supreme Court in *McDonnell Douglas*. *Terry*, 336 F.3d at 141 (2d Cir. 2003). Although the burden that a plaintiff must meet at the *prima facie* stage is minimal, the plaintiff must proffer at least competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. *See Cronin v. Aetna Life Ins.*, 46 F.3d 196, 204 (2d Cir. 1995). As set forth below, the Court finds that plaintiff has made out the *prima facie* case required by *McDonnell Douglas*.

(a) Protected Activity

The term "protected activity" refers to action taken to protest or oppose statutorily prohibited discrimination. *See* 42 U.S.C. § 2000e-3(a) ; *see also Wimmer v. Suffolk Co. Police Dep't*, 176 F.3d 125, 134-35 (2d Cir. 1991). Informal as well as formal complaints constitute protected activity. *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). Moreover, to establish that his activity is protected, a plaintiff "need not prove the merit of his underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed." *Sumner*, 899 F.2d at 209; *see also Grant v. Hazelett Strip-Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir. 1989).

SCPD argues that plaintiff was not engaged in protected activity within the meaning of Title VII as to the SCPD. In particular, the SCPD asserts that plaintiff's involvement as a witness in an investigation by the NYPD of a possible racial incident between an NYPD officer and minority members of the public cannot as a matter of law be a protected activity under Title VII because it does not relate to an *employment practice* by the NYPD, but rather deals with officer treatment of members of the public. *See Wimmer*, 176 F.3d at 135 (opposition by plaintiff to employer's unlawful discrimination toward the public, rather than discrimination against employees, does not constitute protected activity).

However, even assuming *arguendo* that plaintiff's involvement in the investigation as a witness regarding the racial incident by Lieutenant Lombardi and another NYPD officer did not constitute protected activity, it is undisputed that plaintiff also had a pending EEO complaint relating to alleged discriminatory treatment against him by an NYPD Captain. His pending EEO complaint against the NYPD clearly constitutes protected activity under Title VII. *See* 42 U.S.C. § 2000e-3(a) (unlawful to retaliate against employee "because he has opposed any practice made unlawful by this subchapter, or because he has hade a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter"); *see also Cruz*, 202 F.3d at 566 (defining protected activity as an "action taken to protest or oppose statutorily prohibited discrimination").

Moreover, to the extent that the SCPD suggests that it cannot be the subject of a Title VII claim by plaintiff for retaliation because the protected activity involved the NYPD and not the SCPD, the Court also finds that

argument unpersuasive. There is nothing in Title VII that limits retaliation claims to situations where an individual is engaging in protected activity against his or her own employer; rather, the plain language of Title VII clearly prohibits retaliation by an employer against an employee who is taking any action to protest or oppose statutorily prohibited employment discrimination by any employer, whether such protected activity is directed against that individual's employer or some other party with whom that individual has no employment relationship (such as a former employer). S*ee, e.g., Czerw v. Ronald Billitier Electric, Inc.*, Nos. 03-CV-6613, 03-CV-6614 (CJS), 2005 U.S. Dist. LEXIS 22427, at *17 n.3 (W.D.N.Y. May 16, 2005) (plaintiff's lawsuit against one employer constituted protected activity in retaliation claim against subsequent employer); *Martin v. Purolater Courier*, No. 94-CV-1004 (FB), 1996 U.S. Dist. LEXIS 22300, at *23 (E.D.N.Y. July 26, 1996) ("The Court is of the opinion that retaliatory animus is not negated merely because a plaintiff engages in protected activity against a different employer."); *Nielsen v. New York City Comm'n on Human Rights*, No. 94-CV-6360 (JSR), 1998 U.S. Dist. LEXIS 413, at *8 (S.D.N.Y. January 20, 1998) ("While [plaintiff's] purported protected activities are claims against his previous employers . . ., not against the defendant, this does not affect the viability of his retaliation claim. Title VII prohibits an employer from retaliating against an applicant or employee for exercising his statutory rights, however and wherever those rights were exercised.") (citations omitted). Thus, plaintiff's EEO complaint against the NYPD constitutes "protected activity" for purposes of any retaliation claim against the NYPD, as well as against his subsequent employer, the SCPD.

Accordingly, the Court concludes that plaintiff has made a *prima facie* showing that he has engaged in protected activity under Title VII.

(b) Defendants' Awareness of Protected Activity

There is evidence in the record that both the SCPD and the NYPD were aware of plaintiff's protected activity in the form of the EEO complaint. Specifically, plaintiff has offered, among other things, evidence that NYPD Lieutenant Pistere filed the EEO complaint on plaintiff's behalf and NYPD Lieutenant Lombardi called the SCPD and advised them of the protected activity. It is well settled that all that is necessary to satisfy this prong is a "general corporate knowledge that the plaintiff has engaged in a protected activity." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000). Neither the SCPD nor the NYPD deny that someone within their respective entities was aware of plaintiff's protected activity against the NYPD. Therefore, Abreu has established the second element of the *prima* facie case of retaliation.

(c) Adverse Employment Action

The Court also concludes that plaintiff has made a *prima facie* showing with respect to the third element of a retaliation claim, which requires an adverse employment action. With respect to the SCPD, it is axiomatic that termination is an adverse employment action and the SCPD does not contest this element. However, the NYPD argues that it has not contributed to any adverse employment action despite the fact that it is undisputed that NYPD Lieutenant Lombardi contacted the SCPD and told them of plaintiff's protected activity and provided a negative

recommendation. In particular, the NYPD contends that this conduct cannot constitute an adverse employment action as a matter of law because (1) Lieutenant Lombardi contacted the SCPD and made these negative comments about plaintiff on his own and was not authorized to do so by anyone in the NYPD command, and (2) despite the negative comments by NYPD Lieutenant Lombardi, the SCPD chose to hire plaintiff anyway and, thus, no harm resulted. As set forth below, the Court finds these arguments unpersuasive.

The Second Circuit has clearly found that "blacklisting" a former employee or refusing to write a letter of recommendation constitute an adverse employment action which can support a cause of action for retaliation. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 178-79 (2d Cir. 2005); *Silver v. Mohasco Corp.*, 602 F.2d 1083, 1090 (2d Cir. 1979) ("Charges of post-employment blacklisting fall within the broad scope of Title VII."), *rev'd on other grounds*, 447 U.S. 807 (1980); *Pantchenko v. C.B. Dolge Co.*, 581 F.2d 1052, 1055 (2d Cir. 1978) (holding that an employer's refusal to give employee a letter of recommendation is sufficient to state a cause of action for retaliation); *see also Sarno v. Douglas Elliman-Gibbons & Ives*, 183 F.3d 155, 160 (2d Cir. 1999); *DeLuca v. Allied Domecq Quick Service Restaurants*, No. 03-CV-5142 (JFB), 2006 U.S. Dist. LEXIS 39261, at *34 (E.D.N.Y. June 13, 2006); *Cohen v. S.U.P.A. Inc.*, 814 F. Supp. 251, 261 (N.D.N.Y. 1993). In each of these cases, the alleged retaliation arose out of the former employment. *See, e.g., Cohen*, 814 F. Supp. 251, 261 (holding that, to survive summary judgment, alleged retaliation need only show "employer's use of discrimination in connection with a prospective, present or past employment relationship to cause harm to another") (quoting *Pantchenko*, 581 F.2d at 1055); *Patel v. Lutheran Med. Ctr.*, 753 F. Supp. 1070, 1073 (E.D.N.Y. 1991) ("The Second Circuit has held that federal antidiscrimination statutes such as the ADEA, prohibit 'discrimination related to or arising out of an employment relationship, whether or not the person discriminated against is an employee at the time of the discriminatory conduct.'") (quoting *Pantchenko*, 581 F.2d at 1055).

Even if there is no evidence that Lombardi was directed by a superior to contact the SCPD with these negative comments about plaintiff, the absence of such evidence does not entitle the NYPD to summary judgment given the record in this case. Although the Court is unaware of any Second Circuit case directly addressing this precise issue in the context of a retaliation claim, other courts have generally concluded that employers are vicariously liable for retaliatory acts committed by supervisors. *See, e.g., Muraj v. UPS Freight Svcs*, No. 04-CV-6563 (CJS), 2006 U.S. Dist. LEXIS 62274, at *10 (W.D.N.Y. August 31, 2006) ("[I]t appears that, under general principles of vicarious liability under Title VII, an employer may be held vicariously liable for tangible employment actions taken by its supervisors."); *see also Cross v. Cleaver*, 142 F.3d 1059, 1074 (8th Cir. 1998) ("In the circumstances of this case . . . we hold that, where a supervisory employee with the power to hire, fire, demote, transfer, suspend, or investigate an employee is shown to have used that authority to retaliate for the filing of a charge of sexual harassment, the plaintiff need not also prove that the employer participated in or knew or should have known of the retaliatory conduct to hold the employer liable.").

In the instant case, it is undisputed that

13

Lieutenant Lombardi placed two telephone calls to the SCPD applicant investigations unit upon learning of plaintiff's potential employment, identified himself as "on the job" with plaintiff in the NYPD,[5] and generally advised the SCPD of plaintiff's protected activities. As a Lieutenant and a supervisor in the NYPD, it would be reasonable to infer that Lombardi had the authority, at a minimum, to make positive or negative comments or recommendations to other employers in connection with the prospective hiring of current or former NYPD officers. The NYPD has put forth no evidence that would undermine that reasonable inference. Although Lombardi stated to IAB that he made the calls to the SCPD without direction from anyone at the NYPD, that does not necessarily mean that he lacked any authority to comment on his own to third parties, including prospective employers, regarding a police officer's performance at the NYPD. Moreover, the fact that he allegedly abused that authority does not mean it is not actionable. Thus, on the current record, the Court is unable to conclude, at the summary judgment stage, that the lack of involvement by supervisors further up the NYPD hierarchy insulates the NYPD from liability for Lieutenant Lombardi's actions, which arose from plaintiff's employment at the same precinct as the Lieutenant.

The NYPD's second argument challenging the existence of an adverse employment action is similarly unavailing. Although acknowledging that negative job references by a former employer which cause or contribute to a job denial may be considered an adverse employment action, the NYPD argues that no such adverse employment action occurred here because the SCPD decided to hire plaintiff anyway. The Court disagrees with that analysis under the particular circumstances of this case, where plaintiff is claiming that, in essence, there was a retaliatory conspiracy between the NYPD and the SCPD in which the plan was for the SCPD to hire plaintiff so he would leave the NYPD and then the SCPD could quickly fire him as soon as they could find some pretext for doing so. More specifically, plaintiff's claim amounts to the following: (1) the NYPD advised the SCPD that plaintiff was causing them problems by making allegations involving racial discrimination in police investigations and employment; (2) the SCPD agreed to assist the NYPD in getting plaintiff to voluntarily leave his position with the NYPD by offering him a position with the SCPD because the SCPD knew that, as a probationary employee with the SCPD, they could terminate him without providing any justification;[6] and (3) the SCPD did terminate him without justification while he was a probationary employee. (Transcript of Oral Argument, dated September 15, 2006, at 29.) Even if plaintiff is unable to prove a conspiracy to retaliate between the NYPD and the SCPD, alternatively, plaintiff may be able to show that, even if the SCPD supervisor who made the initial hire did not take into

---

[5] Although Officer Michalski does not remember the caller identifying himself, Lieutentant Lombardi believes he did state his name and rank. (Eichenholtz Decl., Ex. I, at 00196.)

[6] Under New York law, "[i]t is well settled that a probationary employee, unlike a permanent employee, has no property rights in his position and may be lawfully discharged without a hearing and without any stated specific reason." *Meyers v. City of New York*, 622 N.Y.S.2d 529, 532 (2d Dep't 1995); *accord Finley v. Giacobbe*, 79 F.3d 1285, 1297-98 (2d Cir. 1996); *Flood v. County of Suffolk*, 820 F. Supp. 709, 713 (E.D.N.Y. 1993); York v. McGuire, 469 N.E.2d 838 (1984).

account this negative recommendation, the decisionmakers responsible for terminating plaintiff as a probationary employee several months later did become aware of, and did take into account, the information provided by Lombardi. In other words, if plaintiff can prove that Lombardi's actions were a motivating factor in the termination decision, either because of a conspiracy or otherwise, the fact that the SCPD initially hired plaintiff would not shield the NYPD from liability for the later termination. Thus, the key issue is whether plaintiff can prove causation, and it is that question to which the Court now turns.

### (d) Causal Connection

It is well settled that if a retaliatory motive played a part in the adverse employment actions, even if it was not the sole cause, the law is violated. *Sumner v. U.S. Postal Service*, 899 F.2d 203, 209 (2d Cir. 1990) (citing *Davis v. State Univ. of New York*, 802 F.2d 638, 642 (2d Cir. 1986); *DeCintio*, 821 F.2d at 116 n.8). Likewise, if the employer was at all motivated by retaliatory animus, the law is violated even if there were objectively valid grounds for the adverse employment action. *Id.* at 209. A plaintiff may establish a causal connection between the protected activity and the adverse employment action either through direct evidence of retaliatory animus, or by circumstantial evidence. *Id.*

Verbal comments may constitute direct evidence of retaliation when made by a decision-maker in the adverse employment action, and where there is a close nexus between the comments and the action. *Rose v. N.Y. City Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001) (finding discriminatory motive where comments were made to plaintiff "on more than one occasion by her immediate supervisor, who had enormous influence in the decision-making process"); *Howe v. Town of Hempstead*, No. 04 Civ. 0656 (DRH), 2006 U.S. Dist. LEXIS 78927, at *22 (E.D.N.Y. October 30, 2006) ("[Discriminatory] comments may constitute evidence of an intent to discriminate, but only if a sufficient nexus exists between the comments and the adverse employment action.") (citing *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 518 (S.D.N.Y. 2004) ("Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff.")). However, such comments must be distinguished from mere stray remarks because, "stray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998). The court must evaluate discriminatory comments in light of all of the evidence presented of discriminatory motive. While "[stray remarks], without more, cannot get a discrimination suit to a jury . . . [w]hen, however . . . other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." *Danzer*, 151 F.3d at 56; *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 458 (2d Cir. 2001).

Where there is no direct evidence of retaliatory animus or a showing of disparate treatment of fellow employees who engaged in the same conduct, proof of causation may be shown indirectly, by demonstrating that the protected activity was followed closely by a retaliatory action. *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d at 117; *Cifra v. GE*, 252 F.3d 205, 217 (2d Cir. 1991) ("[T]he causal

15

connection needed for proof of a retaliation claim 'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'") (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (internal citation omitted)); *Sumner*, 899 F.2d at 209 (holding that a causal connection may be "established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment or through evidence of disparate treatment of employees who engaged in similar conduct or directly through evidence of retaliatory animus"). Although the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Gorman-Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir. 2001), some district courts have generally concluded that "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line." *Cunningham v. Consol. Edison, Inc*., No. 03-CV-3522 (CPS), 2006 U.S. Dist. LEXIS 22482, at *55-56 (E.D.N.Y. March 28, 2006) (collecting cases). However, because the Second Circuit has found periods well beyond two months to be sufficient to suggest a causal relationship under certain circumstances, courts must carefully consider the time lapse in light of the entire record. *See, e.g., Grant v. Bethlehem Steel Corp*., 622 F.2d 43, 45-46 (2d Cir. 1980) (eight-month gap between EEOC complaint and retaliatory action suggested a causal relationship); *see also Richardson v. New York State Dep't of Corr. Serv*., 180 F.3d 426, 446-47 (2d Cir. 1999), abrogated on other grounds, *Burlington Northern & Sante Fe Railway Co. v. White*, 126 S. Ct. 2405 (2006) (abusive acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit more than one year earlier).

In the instant case, defendants argue that no causal connection can be shown because the SCPD, after becoming aware of plaintiff's protected activity by an NYPD Lieutenant, hired him and employed him for several months before terminating his employment. These facts, however, are insufficient to undermine plaintiff's *prima facie* case under the circumstances of the instant case for two principal reasons. First, as noted earlier, one of plaintiff's theories is that the SCPD purposely hired him as a probationary employee (as a favor to the NYPD where he was allegedly causing problems because of his protected activity) with a plan to find a series of pretextual infractions during his probationary period to justify his termination. *See, e g., Bernhardt v. Interbank of New York*, 18 F. Supp.2d 218, 226 (E.D.N.Y. 1998) (eleven months between protected activity and firing might suggest relationship where defendant had possible reasons for delaying the firing). Second, and perhaps more importantly, plaintiff is not simply relying upon temporal proximity to establish a causal connection between the adverse action and the protected activity, but rather also points to direct evidence of retaliatory animus in the form of Detective LaVista's comments to plaintiff in the taped conversation regarding the Commissioner's unwillingness to meet with him regarding his termination. As discussed more fully below, although the meaning and significance of Detective LaVista's comments are disputed by the defendants, this conversation is sufficient to satisfy the plaintiff's minimal burden of establishing a *prima facie* case as it relates to the issue of causation.

### 3. Evidence of Pretext

Having found that plaintiff has met his *prima facie* case, the Court proceeds to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find retaliation. As discussed in connection with the discrimination claim, defendant has articulated a legitimate, nondiscriminatory reason for the termination related to the plaintiff's poor performance. Notwithstanding defendants' proffered nondiscriminatory reasons for plaintiff's termination, defendants' motion for summary judgment as to plaintiff's retaliation claim is denied. There are material issues of fact as to whether plaintiff's termination was handled in a different manner by the SCPD because plaintiff had engaged in a protected activity during his former employment at the NYPD.

Although plaintiff points to the same alleged inconsistencies in the SCPD's disciplinary actions taken against him which the Court found insufficient to support his claim of discrimination based on national origin, the outcome is different as to the retaliation claim because there is additional evidence relating to the issue of pretext that serves to defeat defendants' summary judgment motion. More specifically, plaintiff points first to the telephone calls by NYPD Lieutenant Lombardi to the SCPD to advise them of plaintiff's protected activity, which a reasonable jury could easily infer was done with the specific intent of retaliating against plaintiff. Second, plaintiff points to the taped telephone call with Detective LaVista and argues that the LaVista conversation demonstrates that Lieutenant Lombardi's calls had the desired effect. In particular, plaintiff argues that: (1) Detective LaVista was employed as a Special Assistant to the SCPD Police Commissioner; (2) that, in reference to plaintiff's EEOC complaint with NYPD, Detective LaVista stated, "[t]hey just know it," which plaintiff contends is a reference to the decisionmakers involved in his termination; (3) Detective LeVista further stated, "[a]nd I guess that's what frightened them and they look into it"; and (4) when plaintiff suggested that they "blackball you when you do stuff like that," Detective LaVista responded, "[o]h sure." In her deposition, Detective LaVista denied having personal knowledge that any of the decisionmakers regarding plaintiff's termination were aware of plaintiff's protected activity and such decisionmakers have submitted affidavits stating that they had no such awareness at the time of plaintiff's termination. Moreover, Detective LaVista stated that her other recorded comments, which plaintiff claims suggest that she had personal knowledge regarding retaliation against him or other employees, were misconstrued by plaintiff. Instead, she testified in her deposition that she has no such personal knowledge and was simply "going along with the conversation" with plaintiff. (LaVista Dep. 41.)

It is certainly possible that Detective LaVista's statements to plaintiff may have been entirely lacking in personal knowledge as to plaintiff's termination and were merely prompted by her desire to be cordial to plaintiff as he complained about his termination. However, the Court is not permitted to make such credibility determinations on summary judgment and must view the evidence in the light most favorable to plaintiff, including giving him the benefit of all reasonable inferences from such evidence. Under that standard, the statements by Detective LaVista, combined with the other evidence suggesting that plaintiff's

termination was in part motivated by retaliation for his protected activity while at the NYPD, is sufficient to create a material issue of disputed fact on the issue of pretext that must be submitted to a jury. Accordingly, the defendants' motion for summary judgment on the retaliation claims is denied.

D. State Law Claims

Defendant SCPD argues that plaintiff's state law claims should be dismissed for failure to serve a timely notice of claim upon defendants. For the reasons that follow, plaintiffs' state law claims against the SCPD are dismissed in their entirety.

State claims brought under state law in federal court are subject to state procedural rules. *See, e.g., Felder v. Casey*, 487 U.S. 131, 141 (1988). As such, New York County Law § 52 ("Section 52") applies in this case and provides that

> [a]ny claim or notice of claim against a county . . . for damages arising at law or in equity . . . alleged to have been caused in whole or in part by or because of any misfeasance, omission of duty, negligence, or wrongful act on the part of the county, its officers, agents, servants or employees, must be made and served in compliance with section fifty-e of the general municipal law. . . . Every action upon such claim shall be commenced pursuant to the provisions of section fifty-i of the general municipal law.

Section 52 incorporates the notice of claim requirements contained in New York General Municipal Law §§ 50-e and 50-i ("Section 50-e" and "Section 50-i").[7] Section 50-e requires that a notice of claim be filed within ninety days of the incident giving rise to the claim. Moreover, pursuant to Section 50-i, a plaintiff must plead in the complaint that: (1) the notice of claim was served; (2) at least thirty days have elapsed since the notice of claim was filed and before the complaint was filed; and (3) in that time the defendant has neglected to or refused to adjust or to satisfy the claim. *See Horvath*, 423 F. Supp. 2d at 423. The plaintiff bears the burden of demonstrating compliance with the notice of claim requirement. *Id.*; *see Rattner v. Planning Comm'n of Vill. of Pleasantville*, 548 N.Y.S.2d 943 (N.Y. App. Div. 1989). In this case, it is undisputed that plaintiff (1) has failed to comply with any of these requirements and (2) has yet to file a notice of claim upon Suffolk County.

"Notice of claim requirements are construed strictly by New York state courts. Failure to comply with these requirements ordinarily requires a dismissal for failure to state a cause of action." *Hardy v. New York*

---

[7] While Sections 50-e and 50-i specifically apply to tort claims under New York law, Section 52 applies their service requirements to "[a]ny claim or notice of claim against a county for . . . invasion of personal or property rights, of every name and nature." *See Feldman v. Nassau County*, 349 F. Supp. 2d 528, 539 (E.D.N.Y. 2004) (finding that Section 52, "the statute applicable to plaintiff's claims against Nassau County . . . is broader than" Section 50-e, and that the "notice of claim provision of [Section] 52 covers plaintiff's [employment discrimination] claims against Nassau County"); *Gallo v. Suffolk Cty. Police Dept.*, 360 F. Supp. 2d 502, 511-512 (E.D.N.Y. 2005); *Horvath v. Daniel*, 423 F. Supp. 2d 421, 423 (S.D.N.Y. 2006) (finding that Section 52 incorporates the notice of claim requirements contained in Section 50-i).

*City Health & Hosp. Corp.*, 164 F.3d 789, 793-94 (2d Cir. 1999) (internal quotations and citations omitted); *see Horvath*, 423 F. Supp. 2d at 423 ("Absent a showing of such a Notice of Claim, the complaint may be dismissed for failure to state a cause of action.") (internal quotation omitted). Accordingly, for the state law claims asserted in this case, "[t]he failure to file a notice of claim is fatal unless the action has been brought in the public interest, such as a class action brought to protect civil rights, or a court has granted leave to serve late notice." *Pustilnik v. Hynes*, No. 99-CV-4087 (JG), 2000 WL 914629, at *6 (E.D.N.Y. June 27, 2000) (citing *Mills*, 59 N.Y.2d 307 (N.Y. 1983)).

The Court finds that the instant action does not constitute an action brought in the public interest. *See, e.g., Feldman*, 349 F. Supp. 2d at 539 (finding employment discrimination claim that "seeks the enforcement of [plaintiff's] private interests" is not in public interest); *Atkins v. County of Orange*, 251 F. Supp. 2d 1225, 1235 (S.D.N.Y. 2003) ("[T]he public interest exception [to the notice of claim requirement] does not apply when plaintiffs are seeking money damages for the sole purpose of redressing plaintiffs' individual injuries."); *Atkins*, 251 F. Supp. 2d at 1235 (finding that, while plaintiffs' recovery might have an effect on others' interests, "we do not think such an effect would be of any greater value to the public than any other award to civil rights plaintiffs"); *Turner v. County of Suffolk*, 955 F. Supp. 175, 177 (E.D.N.Y. 1997).

Accordingly, the state law claims against the SCPD must be dismissed.[8] *See Gaffney*, 182 F. Supp. 2d 278 (E.D.N.Y. 2001) (dismissing NYHRL claims for failure to serve timely notice of claim); *Turner*, 955 F. Supp. 175 (same) (NYCSL 107 claim); *Flynn v. New York City Bd. of Educ.*, No. 00-CV-3775 (LAP), 2002 WL 31175229, at *9-*10 (S.D.N.Y. Sept. 30, 2002) (same) (New York Labor Law claim); *Alexander v. City of New York*, No. 02-CV-3555 (TPG), 2004 WL 1907432, at *22 (S.D.N.Y. Aug. 25, 2004) ("[T]he New York notice of claim requirement applies . . . to actions founded upon violations of state constitutional provisions.").

---

[8] The Court does not believe that it has jurisdiction to consider and grant an application for an extension of time to file a notice of claim and no such motion has been made. *See Henneberger v. County of Nassau*, 465 F. Supp. 2d 176, 198-99 (E.D.N.Y. 2006). However, even assuming plaintiffs had requested leave to file late notice and the Court had jurisdiction, the Court is unaware of any grounds that would support such an extension in the instant case.

19

## IV. CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is (1) granted as plaintiffs' discrimination claims based upon national origin, and (2) denied as plaintiff's Title VII retaliation claims against the SCPD and the City of New York. The state claims against the SCPD are dismissed for failure to file a notice of claim. The motion for summary judgment in favor of the NYPD, to the extent it is named as a separate defendant from the City of New York, is also granted.[9]

SO ORDERED.

JOSEPH F. BIANCO
United States District Judge

Dated: February 23, 2007
Central Islip, NY

\* \* \*

The attorney for plaintiff is Saul D. Zabell, Esq., Zabell & Associates, P.C., 700 Lakeland Avenue, Bohemia, New York 11716. The attorney for the Suffolk County Police Department is Christine Malafi, Suffolk County Attorney, by Chris P. Termini, Assistant County Attorney, 100 Memorial Highway, Hauppauge, New York 11788. The attorney for the City Defendants is Michael A. Cardozo, Corporation Counsel of the City of New York, by Robert Katz and Eric Eichenholtz, 100 Church Street, New York, New York 10007.

---

[9] In addition to suing the City of New York, plaintiff also names the NYPD as a defendant. However, the NYPD, as an agency of the City of New York, cannot be sued independently. *See* N.Y. City Charter, Chapter 17, § 396 ("[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York"). Thus, the NYPD is a non-suable entity and the independent claim against it is dismissed. *See Hyde v. Arresting Officer Caputo,* No. 98-CV-6722 (FB), 2001 WL 521699, at \*2 (E.D.N.Y. May 11, 2001); *Bailey v. New York City Police Dep't*, 910 F. Supp. 116, 117 (E.D.N.Y. 1996).